IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| YVONNE CADIZ, as Mother and Guardian of MICHAEL CADIZ, a minor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 06 C 5463 |
| | ) | Magistrate Judge Schenkier |
| MICHAEL KRUGER, et. al., | ) ) | |
| Defendants. | ) | **JURY DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF CHICAGO'S
MOTION TO BIFURCATE § 1983 CLAIMS AND STAY
DISCOVERY AND TRIAL ON THOSE CLAIMS**

Plaintiff, Yvonne Cadiz, as Mother and Guardian of Michael Cadiz, a minor, by her attorneys, Jared S. Kosoglad and Christopher R. Smith, A Law Office Of Christopher R. Smith, respectfully responds to defendant City of Chicago's Motion, as follows.

Plaintiff's Complaint alleges that the City of Chicago maintains a practice or policy of failing to monitor, discipline, and otherwise control its police officers, and that this practice or policy resulted in several police officers being able to subject a twelve year-old boy and his thirteen year-old cousin to devastating physical abuse. Plaintiff also complains about the City's support for a police officer code of silence.

**Background**

In 2003, defendant Ferraro beat a man, perforating his spleen. *See* Def.'s Exhibit E, pp. 2-3, 5 ¶ 2. The Chicago Police Department's Office of Professional Standards made a sustained finding related to that incident, sometime in 2004. Over four years after perforating a citizen's

1

organs, defendant Ferraro remains unpunished. On May 20, 2006, armed with personal knowledge that he will not be meaningfully punished, defendant Ferraro stomped on two children, causing severe psychological damage and head injuries.

Defendant Ferraro's police career includes a conviction for driving under the influence, peppered by allegations of serious violence and breaches of the public trust, such as threats to kill his own children. *See* Exhibit 1, Officer Ferraro CR summary. Defendant City's policies and practices allowed and encouraged Defendant Ferraro to brutalize Yvonne Cadiz' thirteen year-old son into unconsciousness.

**I. By Its Motion To Bifurcate, Defendant City Seeks To Avoid Liability Altogether, Through a De Facto Dismissal of Plaintiff's Monell Claims**

Defendant City's Motion to Bifurcate asks this Court to excuse the policies and practices that led to the beating of a thirteen year-old by preventing plaintiff from testing *Monell* liability on its merits. The result of the relief requested in defendant City's Motion is a complete end run around the Federal Rules of Civil Procedure governing discovery and clear pronouncements of the United States Supreme Court. *See* Fed. R. Civ. P. 26(d) (Advisory Committee Notes) ("[M]ost commentators are agreed that courts in fact grant relief [from the normal sequence of discovery] only for the most obviously compelling reasons.") (internal quotation marks omitted); *see also Monell v. Dept. of Social Services* 436 U.S. 658, 694 (1978) (holding that local governments can be sued under § 1983 when "execution of a government's policy or custom . . . inflicts the injury.").

*Monell* claims are a viable source of relief in federal court. The suggestion that plaintiff's *Monell* claim should be excised from her complaint, never to be examined or tried is extremely troubling. Defendant City of Chicago is not entitled to decide which of the named defendants

should have to defend against Plaintiff's accusations and which should not, inconvenience and expense notwithstanding. Most litigants would prefer to avoid the inconvenience and burden of discovery and trial. Such considerations, however, do not relieve parties of their obligation to participate in the process. The City's participation in discovery serves an important societal objective, enforcing the City's accountability for systemic practices that cause constitutional harm. Given the City's efforts to veil their systemic practices, the words of the Supreme Court in *Owen v. City of Independence*, 445 U.S. 622 (1980), come into prescient focus:

> How uniquely amiss it would be, therefore, if the government itself – the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct – were permitted to disavow liability for the injuries it has begotten. A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

*Id.* at 650 (citations and internal quotation marks omitted). Plaintiff alleges that the City *is* an offending party, not merely an indemnifying one. Plaintiff seeks to pursue municipal liability.

## II. Granting Defendant City's Motion Would Not Promote An Efficient Resolution

In mid-November, 2007, the City appeared before this Court and represented that dozens of and damages witnesses still needed to be deposed. *See* City's Motion To Bifurcate, ¶ 7. The City cannot reconcile this representation with its claim that *Monell* discovery alone will be responsible for pushing discovery, "well into next year."

Overtly, the City's Motion is an attempt to avoid 1) production of documents; 2) depositions; 3) expert discovery; 4) judicial intervention in discovery disputes; 5) a ruling on City's summary judgment motion; and 6) a trial. Although not explicitly stated by its motion, defendant City seeks to avoid liability for the damages it caused under the guise of bifurcation.

And the relief requested by defendant City is an attempt to moot plaintiff's right to make a claim for damages under *Monell*, 436 U.S. at 694.

### A. The City's Motion Seeks No Resolution

The City's Motion repeatedly suggests that the real issues in this case arise from a "single incident," – as if the real issues in this case have nothing to do with the City or its unconstitutional practices. *See* Motion To Bifurcate, ¶ 8. Nothing could be further from the truth. The City's failure to monitor, discipline, and otherwise control its police officers allowed the infliction of devastating physical abuse onto Michael Cadiz. The fact that the City has done nothing to stop defendant Ferraro is not a side issue in this case. It is an issue of crucial importance, not only to the Cadiz family, but to all of their fellow citizens living in Chicago – all of whom have an interest in ensuring that their government abides by the Constitution. As the Supreme Court has stated:

> Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance . . . If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual, suffers.

*City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986); *see also Holmes Group, Inc. v. Vornado Air Circulation Sys. Inc.*, 535 U.S. 826, 831 (2002) (noting that "plaintiff is the master of the complaint") (internal quotation marks omitted).

The Second Circuit echoed these statements in *Amato v. City of Saratoga Springs*, 170 F.3d 311 (2d Cir. 1999), noting that while, "[t]he ability to promote an individual officer's 'scrupulous observance' of the Constitution is important," it was, "[p]erhaps even more

4

important to society, however . . . to hold a municipality accountable where official policy or custom has resulted in the deprivation of constitutional rights." *Id.* At 317-319 (supporting this reasoning with a review of the history of § 1983 and relevant case law). Courts in this district have recognized the importance of this principle as well. In *Doe v. Marsalis*, 202 F.R.D. 233 (N.D. Ill. 2001), Judge Castillo considered the motion of a newspaper to intervene in a civil rights case in order to obtain copies of documents marked as "confidential" pursuant to a protective order. In considering the importance of public scrutiny of the City of Chicago's police practices, the Court noted the City's recent agreement to pay $18 million to settle a police misconduct case, and stated:

> The recent settlement is a good example of the bad cop syndrome that the City taxpayer underwrites, which follows a familiar formula: police misconduct – seriously aggrieved or sometimes dead victim = lawsuit = settlement paid by taxpayer = no real changes or evaluations to prevent further misconduct. This ugly and expensive syndrome must come to an end. ***The only way to end this syndrome is to evaluate and reevaluate past practices.***

*Id.* at 238 (footnote omitted) (emphasis added).

Over four years after defendant Ferraro perforated the spleen of Sam Guardino, on May 20, 2006, defendant Ferraro's conduct gave rise to three lawsuits: *Cadiz v. Kruger, et. al.*, Case No. 06 C 5463 (Schenkier, J.) (brought by Michael's cousin for a concurrent beating) (discovery in this case and the instant case has proceeded in parallel), *Rice v. City of Chicago, et. al.*, Case No. 06 C 4342 (Filip, J.) (involving a third teenager plaintiff and taking place nearly one hour before the beating of Josh and his cousin ) (settled), and the instant case.

The subjects at issue here do involve a significant amount of discovery. But the seriousness of the constitutional violations alleged demand no less. Specifically, the Cadiz' have challenged system-wide constitutional violations by the City of Chicago – a government body

charged with protecting the rights of millions of citizens. They have alleged that the City turns a blind eye to the abuse caused by its police officers, and the policies and practices that allow such abuse to continue unchecked. The City knew about Ferraro's history of excessive force and other misconduct, and did nothing. Defendant City still has done nothing.

The City's argument that everyone is better off by mooting its liability under *Monell* is nothing short of offensive. Neither the Cadiz family nor any of their fellow citizens are served by the City burying its practices from judicial and public scrutiny. Indeed, it is precisely this kind of unwillingness to engage in an examination or public airing of its own practices that led to Michael's abuse.

Perhaps the City has decided that it would rather pay judgments against abusive officers, while turning a blind eye to the practices that enable that abuse. But deliberate indifference is a constitutional violation, as much as the beating of a thirteen-year old boy. The Cadiz family has properly alleged a claim against the City for this unconstitutional conduct. Neither law nor common sense demands that the City now be relieved of its obligations to defend itself.

### B. Monell Discovery Overlaps With Fact Discovery

Contrary to the City's claim that bifurcation will avoid judicial intervention in discovery disputes, bifurcation will create significant disputes over whether discovery is fact or *Monell* related. The complaint register files of defendant Ferraro, requested by plaintiff, aside from relevance to Monell, are reasonably calculated to lead to admissible evidence of defendant Ferraro's intent to beat Michael Cadiz, motive for doing so, preparation of his defense that Michale fell, plan for covering up his unlawful conduct, the absence of an accident, and defendant Ferraro's knowledge that he can repeatedly succeed in victimizing Chicago's citizens

without any fear of discipline. Undoubtedly, the City will next argue that plaintiff cannot learn about defendant Ferraro's documented history of abuse at all and that defendant Ferraro's C.R. files have no relevance, if the Court grants this motion.

There is a good deal of evidence in this case relevant to the Cadiz' claims against the individual defendants and potentially admissible under Fed. R. Evid. 404(b) that also is relevant to the Cadiz' claims under *Monell.* At least one result of the Court's entering an order granting the City's requested relief would be constant squabbling over whether particular discovery is truly policy related or whether the discovery relates to the claims against the individual officers. Some deponents might have to appear twice for a deposition – once to testify about what they know of the claims against the officers and then again several months later to testify about the Cadiz' *Monell* claims.[1]

Plaintiff has invested a good deal of effort through document discovery, depositions, research, consultations, and other measures to pursue discovery on her *Monell* claim. The efficient resolution of plaintiff's claims is not served through trading the expense of future work for the resources already expended.

### C. The City Argues For A False Economy

While the City couches its motion as one seeking efficiency, what the City actually seeks is a judicial order shielding its unconstitutional practices from any sort of public scrutiny. In doing so, the City does not promote judicial economy. They City argues for a false economy – one in which federal courts in this district continue to be flooded with civil rights cases, caused by egregious and unconstitutional policies that do not get challenged on their merits. Instead of

---

[1] This would include ADS Epplen, who the defendants have agreed to produce for deposition, outstanding OPS depositions, several of whom have already been deposed, and potentially includes Interim Superintendent Starks, already noticed for deposition.

7

conserving judicial resources, the ability to hide the very policies which keep causing thousands of civil rights cases only increases the burden on federal courts.

### D. *Monell* Liability Is Inexorably Intertwined With Plaintiff's Claims

The facts of this case warrant leave to pursue the City's liability. Provided below are samples of the arguments plaintiff will make at trial.

#### i. Discipline

The City of Chicago was deliberately indifferent toward the plaintiff's Fourth Amendment right to be free of excessive force. Even though defendant City knew that Ferraro had beaten a man so as to cause internal bleeding and a ruptured spleen, defendant City has waited over four years to discipline him, during which time he caused head injuries to a twelve and thirteen year-old. . . . *See* Def.'s Exhibit E, pp. 5-6.

Moreover, Defendant Ferraro had personal knowledge of the City's failure to discipline its police officers. Over the course of several OPS investigations into his conduct, defendant Ferraro learned that OPS would not sustain allegations against him and that even when OPS was required to sustain an allegation, as it did against defendant Ferraro for rupturing a man's spleen, no discipline would be forthcoming. Upon information and belief, Defendant Ferraro tried the same tired defense he used in the *Guardino* case to explain the injuries to the two boys: Guardino and Michael Cadiz fell.

#### ii. Investigation

OPS Investigator Sanchez never even attempted to speak with many witnesses. She ignored the existence of other police officers at the scene of the arrest, including Lieutenant Clark, who now claims to be an eyewitness to Michael's injuries. She never located Jerry Blythe, who claims he saw one of the officers standing on a child's head. She never found Gary

Rademaker, who upon information and belief will testify that several men, possibly police officers, hurdled a fence to get to the scene of the arrest. Investigator Sanchez refused to investigate defendant Sliva at all, notwithstanding defendants Beese and Ferraro's indication that he was present when Josh claims officers engaged in physical abuse. After several months of alleged investigation, Investigator Sanchez dismissed the complaint based on the corroborative testimony of an officer who admits to seeing nothing and another officer accused of participating in the beating, defendant Sliva here. Plaintiff submits that the other OPS investigations conducted of defendant Ferraro will evidence the same shocking pattern of indifference.

In fact, the day after the incident occurred, both Assistant Deputy Superintendent Lee Epplen and then First Deputy Superintendent Dana Starks were aware of the incident through a memorandum, word of mouth, and conversations with other police officers. High level officials in the Chicago Police department were immediately aware of the potential implications of Defendant officers' actions. And instead of addressing the event and investigating what happened, the Chicago Police Department went into full cover-up mode. Plaintiff, upon information and belief, believes that Dana Starks, now the highest level policy maker in the Chicago Police Department, actively thwarted the basic mission of the Office of Professional Standards in this case and many others, in an effort to prevent adequate investigations and discipline of criminal activity by the police department.

### iii. Code of Silence

Not only the defendants here but several police officers in this case have distorted or omitted their account of every fact that would tend to implicate police wrongdoing. After observing the after effects of the defendants' brutality, Detective Crespo told the family to make a complaint once at the hospital, which Detective Crespo now denies. *See* Exhibit 2, Samantha

9

Cardenas dep., p. 73, lines 8-11. The emergency room doctor told Sergeant Collela that the injuries evidenced direct blows, a fact the sergeant omitted from any report and now does not remember. *Transcript unavailable.* Even though several search warrant police officers were in the alley after the plaintiff's arrest, all of them now deny any personal knowledge of the circumstances of Michael Cadiz's arrest.

III.     **Other Courts In This District Have Rejected Similar Efforts By The City**

While the City seeks to convey the impression that courts routinely grant motions like the City brought here, the fact is that many judges in this district have denied just this type of motion.  See *Bond v. Utreras,* Case No. 04 C 02617 (Keys, M.J.) *Kasper v. City of Chicago*, Case No. 04 C 1041 (St. Eve, J.); *Williams v. Nine Fifty Ltd., et. al.*, Case No. 03 C 5077 (Gottschall, J.); *Patterson v. Burge*, Case No. 03 C 4433 (Gottschall, J.); *Williams v. City of Chicago*, Case No. 03 C 4388 (Pallmeyer, J.); *Daval v. City of Chicago*, Case No. 02 C 7955 (Leinenweber, J.); and *Watts v. City of Chicago*, Case No. 01 C 4010 (Hibbler, J.); *see also Doles v. Harvey*, 04 C 0797 (Keys, J.) (motion filed by City of Harvey, Illinois).  True and correct copies of the orders in these cases are attached as Exhibit 3 to this response.  The reality that plaintiff may not gain additional compensation on the policy claim alters neither Plaintiff's desire nor her rights to pursue these claims.

WHEREFORE, Plaintiff Yvonne Cadiz, as Mother and Guardian of Michael Cadiz, prays that this Honorable Court deny defendant City of Chicago's Motion To Bifurcate And Stay Discovery And Trial.

Respectfully submitted,

/s Jared S. Kosoglad

One of plaintiff's attorneys

Jared S. Kosoglad
Christopher R. Smith
119 North Peoria Street, Suite 3A
Chicago, Illinois 60607
312-432-0400

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that he served a copy of this Certificate of Service and accompanying response on the below-listed attorneys by electronic means on November 23, 2007.

**BY ELECTRONIC MEANS:**

Elizabeth Ekl, James Sotos, John Boyd
James G. Sotos & Associates
550 East Devon, Suite 150
Itasca, IL 60143

s/ Jared S. Kosoglad

Jared S. Kosoglad
A LAW OFFICE OF CHRISTOPHER R. SMITH
119 N. Peoria Street, Suite 3A
Chicago, IL 60607
312-432-0400